**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee,*

v.

JOSHUA TIMOTHY RODGERS,
　　　　　　　*Defendant-Appellant.*

No. 10-30254

D.C. No.
3:10-cr-05038-
RJB-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, Senior District Judge, Presiding

Argued and Submitted
May 3, 2011—Seattle, Washington

Filed September 7, 2011

Before: Mary M. Schroeder, M. Margaret McKeown, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Callahan

17001

---

## COUNSEL

Mary Anne Royle (argued), Vancouver, Washington, for the defendant-appellant.

Jenny A. Durkan, United States Attorney, and Jill Otake (argued), Assistant United States Attorney, U.S. Attorney's Office, Seattle, Washington, for the plaintiff-appellee.

---

## OPINION

McKEOWN, Circuit Judge:

Passenger and vehicle searches have played a prominent role in Fourth Amendment jurisprudence. The Supreme Court has consistently held that probable cause is necessary to conduct a warrantless search of a vehicle. *See Carroll v. United States*, 267 U.S. 132, 160-62 (1925); *California v. Carney*, 471 U.S. 386, 390 (1985). In recent years, the Court has clarified that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," the search may extend to any area where evidence might be found. *See Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)). In addition, when an arrest is made, a warrantless search is permitted "if the arrestee is within reaching distance of the passenger compartment . . . or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 1723. But the Court has never sanctioned a vehicle search simply because there was probable

cause to arrest a passenger or because a passenger could not provide identification. The Fourth Amendment requires more.

## BACKGROUND

The facts in this appeal are not in dispute. On December 16, 2009, at approximately 3:30 a.m., Police Officer Ryan Moody was patrolling the area of South 84th Street and South Hosmer Street in Lakewood, Washington, a high crime location known for juvenile prostitution and vehicle theft. During the course of his duties, Moody performed random license plate checks on passing vehicles, "[l]ooking for warrants, suspended drivers, [and] stolen vehicles."[1] Moody ran a routine check on a black Pontiac Grand Am. The registration record indicated that the car was registered to an individual named Joshua Rodgers. Moody noticed, however, that "the colors didn't match": the registration listed the car as gold, but the car observed by Moody was black. Moody testified that he often encountered license plates that had been removed from one vehicle and placed on a stolen vehicle of the same make and model to conceal a car's stolen status.[2] Thus, suspecting that the car might be stolen, Moody stopped the vehicle and approached on foot.

Upon reaching the driver's side of the car, Moody immediately recognized Rodgers from two prior traffic stops.[3] Rodgers was cooperative and explained that he had painted his vehicle but did not have money to update his registration. Rodgers provided Moody with a valid driver's license, which

---

[1]The quotations used throughout this section are taken from Moody's testimony before the district court. Moody was the only witness to appear, and the district court adopted his testimony as the court's findings of fact.

[2]The parties agree that the failure to update a vehicle's registration after it has been painted is not a citable offense under local or state law.

[3]In fact, Moody previously stopped Rodgers' vehicle for the exact same reason—the discrepancy between the color listed on the registration and the car's physical appearance.

confirmed that he owned the car. Moody also checked to make sure that the vehicle identification number listed on the registration record matched the number on Rodgers' vehicle.

At some point during the stop, Moody looked into Rodgers' car and noticed a young female in the front passenger seat. The young woman "appeared to be Caucasian" and "seemed nervous, didn't want to make eye contact." Based on her appearance, Moody thought that the girl was twelve to fourteen years old. Recalling that Rodgers was 51 years old according to his license, Moody asked Rodgers about the young woman. Rodgers responded that she was simply a friend and that he was giving her a ride to a nearby apartment complex. This scenario "obviously raised [Moody's] suspicion more, being that he's a 51-year-old male, and the way she appeared [ ] was a 12-to-14-year-old female." Given the time of day and the high-crime location, Moody's "first inclination was that she was probably an underage prostitute." Moody also had concerns that the young woman "could have been a run-away" or "a missing person."

Suspecting that Rodgers might be "pimping out the female," Moody continued to investigate and asked the young woman for identification. The young woman responded that she "didn't have any" ID, but she provided her name, S.F.,[4] and indicated that she was 19 years old. S.F. stated that her birthday was January 7, 1990, which was consistent with her stated age of 19 years old. Based on her physical appearance, however, Moody believed that S.F. was lying about her age. He went back to his police car to run a check on the name provided by S.F. and discovered that there was an outstanding arrest warrant on a felony robbery charge for an individual with the same name and month and day of birth that S.F. provided. The birth year listed, however, was 1993. Moody thought the woman in the car was "possibly" the same person

---

[4]Because S.F. is a juvenile, her initials have been used throughout these proceedings to protect her identity.

named on the warrant, but he still had doubts. Moody testified that in his experience, people sometimes "provide fake or false names and, to their surprise, the name that they provided has a warrant for their arrest." Moody requested that another officer respond to the scene. When backup arrived, Moody removed Rodgers and S.F. from the vehicle and separated them to further investigate S.F.'s identity and her relationship to Rodgers. Neither Rodgers nor S.F. was placed in handcuffs, and Moody never testified that he had any concerns for his safety. Once outside the car, Rodgers claimed that he had just met S.F. and that a friend of his asked him to give her a ride.

Moody testified that S.F.'s identity was still not clear to him, so "based on the fact that [he] felt she lied to [him], provided a false statement to [him], [he] wanted to check to see if she had any ID that [he] could actually confirm her identity with." S.F. had previously indicated that she "didn't have any" identification, and Moody did not see a purse or bag that could harbor S.F.'s identification. Moody testified, however, that he believed S.F. had identification because "if she's going to stick with a story about being 19 years old," based on his training and experience, Moody thought "most 19-year-olds have some form of identification." Notably, Moody did not perform a search of S.F.'s person. While S.F. was secured by another officer at the rear of the vehicle, however, Moody proceeded to search the passenger area of Rodgers' car.

Moody never found any identification. In the center console of the car, however, Moody located a black case containing three bags of a crystalline substance later identified as methamphetamine. The officers placed Rodgers under arrest. A search of Rodgers' person uncovered marijuana, twenty oxycodone pills, and 284 dollars in cash. A full search of Rodgers' car led to the discovery of a firearm, used methamphetamine pipes, and what appeared to be a ledger. Rodgers was taken to the Pierce County Jail, where he admitted to sell-

ing narcotics. S.F. was arrested, taken to a juvenile facility, and booked on the robbery warrant.

A grand jury returned an indictment charging Rodgers with possession of methamphetamine and oxycodone with intent to distribute in violation of 21 U.S.C. § 841, with being a felon in possession of a firearm and an armed career criminal in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1), and with possession of a firearm during the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Rodgers filed a motion to suppress the physical evidence obtained from his person and vehicle as well as the statements he made to the police after his arrest. The district court held an evidentiary hearing, during which Moody was the only witness to testify. In adopting Moody's testimony as its findings of fact, the court credited Moody as "entirely believable." Although clear in its praise for Moody, the district court's oral ruling was less specific on other findings. Despite denying Rodgers' motion to suppress and upholding the search, the court never made any specific finding that the search of Rodgers' car was supported by probable cause or any other level of particularized suspicion. Rodgers stipulated to a bench trial, and the court convicted him on all counts. Rodgers appeals the denial of his suppression motion, arguing that the initial stop, the extended duration of the seizure, and the search of his vehicle all violated the Fourth Amendment. We review de novo the district court's denial of the motion to suppress, but review the court's underlying findings of fact for clear error. *See United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010); *United States v. Turvin*, 517 F.3d 1097, 1099 (9th Cir. 2008).

## ANALYSIS

### A. The Investigatory Stop

[1] The standards that govern investigatory traffic stops are well known. Police may stop a car to investigate individuals

only where there is "reasonable suspicion" of illegal activity. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc); *see also Terry v. Ohio*, 392 U.S. 1 (1968). Here, Moody relied on two independent factors to justify stopping Rodgers' car: the color discrepancy between the car's registration record and the vehicle's physical appearance and Rodgers' presence in a high-crime area. Rodgers contends that these two objective observations indicate entirely innocuous conduct and thus cannot give rise to reasonable suspicion.

**[2]** We agree that the color discrepancy and high-crime location, even when considered cumulatively, at best provide a thin basis for reasonable suspicion that the car was stolen. The failure to update a vehicle registration to reflect that a car has been painted is not a citable offense under state or local law; it is also, of course, not illegal to drive in a high-crime area. Nevertheless, whether Moody had reasonable suspicion to stop Rodgers' vehicle is an exceedingly close question that we need not answer here. Because we reverse the district court's denial of Rodgers' suppression motion on a separate ground, we will assume, without deciding, that reasonable suspicion supported the stop.

## B. The Continuing Investigation

**[3]** Next, Rodgers challenges the duration of the stop, arguing that even if the initial stop was constitutionally sound, Moody impermissibly extended its scope and duration. We disagree. A "period of detention [may be] permissibly extended [where] new grounds for suspicion of criminal activity continue[ ] to unfold." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005).

**[4]** Throughout the stop the situation was evolving, and new particularized factors arose that supported the continued detention of both Rodgers and S.F. As the district court observed, Moody obtained bits and pieces of suspicious infor-

mation over time that required additional investigation. Moody initially observed an extremely young woman in the car with Rodgers, a fifty-one-year-old male, at 3:30 in the morning, in an area known for juvenile prostitution. Based on the late hour and the stark differences in age, Moody appropriately continued to investigate the situation by asking a limited number of questions to both Rodgers and S.F. Rodgers' explanation—that S.F. was a friend who needed a ride—failed to dispel Moody's suspicion given the late hour. S.F.'s statements about her age, which did not appear consistent with her appearance, also raised a red flag. *See, e.g.*, *United States v. Torres-Sanchez*, 83 F.3d 1123, 1128 (9th Cir. 1996) (holding that continued detention was justified where the defendants' answers "failed to dispel [the officer's] suspicions about illegal activity and actually created new ones").

**[5]** Once Moody discovered the outstanding arrest warrant for S.F., his suspicions escalated further because he now had additional information to suggest that S.F. had lied about her identity. Although Moody *could have* arrested S.F. at that time and released Rodgers, Moody had ongoing, legitimate suspicions that Rodgers was engaged in ongoing criminal activity, particularly juvenile prostitution. Because "new grounds for suspicion of criminal activity continued to unfold," the extended duration of the stop was permissible. *Mayo*, 394 F.3d at 1276.

## C.  The Vehicle Search

**[6]** We turn next to the search of Rodgers' car, which is the crux of this appeal. The Government acknowledges that probable cause was necessary to support the search, and asks us to rely on the automobile exception to the warrant requirement as addressed by the Supreme Court in *United States v. Ross*, 456 U.S. 798, 820-22 (1982).[5] "Under the automobile

---

[5]In its briefing and at oral argument, the Government relied exclusively on *Ross,* 456 U.S. at 820-22, and argued that probable cause, not some less

exception . . . , police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). "Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

**[7]** The Government asserts that Moody had probable cause to believe that S.F. committed two misdemeanor offenses under Washington law: obstructing a law enforcement officer in violation of Wash. Rev. Code § 9A.76.020,

demanding standard, was needed to justify the search of Rodgers' vehicle. At argument, the Government expressly acknowledged that it was not relying on *Arizona v. Gant*, 129 S. Ct. 1710 (2009), and the search incident to arrest exception to the warrant requirement, which appears to require a level of suspicion less than probable cause, *see United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010) ("Presumably, the 'reasonable to believe' standard requires less than probable cause, because otherwise *Gant's* evidentiary rationale would merely duplicate the 'automobile exception,' which the Court specifically identified as a distinct exception to the warrant requirement."). Although the Government's rationale is hardly clear—was it bench marking probable cause against the outstanding warrant?—in the end it doesn't matter because the Government did not preserve the issue. *See United States v. Ewing*, 638 F.3d 1226,1229-30 (9th Cir. 2011) (holding that the government, as appellee, waived any argument with respect to the district court's ruling on defendant's standing to challenge the search of his vehicle because the issue was not argued in the government's briefs); *see also Arizona v. Hicks*, 480 U.S. 321, 326 & n.* (1987) (because the state decided to concede, possibly erroneously, that police only had reasonable suspicion, not probable cause, to search, the Court determined that the issue was not preserved and adopted the state's concession on that legal question). In addition, as a warrantless search, the Government bears the burden of proving that a "specifically established exception[ ] to the warrant requirement" applies. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001) (internal quotation marks omitted). It is not our role to engineer a path for the Government to meet that burden, especially where it has conceded that it is not relying on a certain exception to the warrant requirement.

and making a false or misleading statement to a public servant, in violation of Wash. Rev. Code § 9A.76.175. The Government apparently assumes that because probable cause existed to arrest S.F. (that is, probable cause existed to believe S.F committed a crime) it follows *a fortiori* that Moody had probable cause to search the vehicle for evidence of that crime.

This approach, however, elides an important distinction between probable cause to search and probable cause to arrest. In *United States v. Henderson*, we explained that

> [t]he focus of the arrest inquiry is different from that of the search inquiry. *See Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996). Officers have probable cause for an arrest if at the time of the arrest, "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing" that the defendant committed an offense. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Officers have probable cause for a search when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "[T]here may be probable cause to search without probable cause to arrest, and vice-versa." *Id.* (citing 2 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 3.1 (b) at 9 (3d ed. 1996)).

241 F.3d 638, 647-48 (9th Cir. 2000).

Both the Supreme Court and this court have highlighted this distinction. *See, e.g.*, *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but

that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. O'Connor*, 658 F.2d 688, 693 n.7 (9th Cir. 1981) ("Probable cause to arrest concerns the guilt of the arrestee, whereas probable cause to search an item concerns the connection of the items sought with the crime and the present location of the items."); *Millender v. County of Los Angeles*, 620 F.3d 1016, 1029 n.6 (9th Cir. 2010) (en banc).

**[8]** The relevant question with respect to the *search* is whether there was "probable cause to believe that the vehicle contain[ed] evidence of a crime." *Brooks*, 610 F.3d at 1193. We conclude that there was not. A finding of probable cause must be supported by the objective facts known to the officer at the time of the search. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (the "factual determinations bearing upon search and seizure . . . must be judged against an objective standard" based on "the facts available to the officer at the moment" (internal quotation marks omitted)). The inquiry is a particularized one, requiring factual specificity that "evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010). Police "obtain probable cause because the *facts* indicate that they will find what they are looking for in the place to be searched." *United States v. Johnson*, 256 F.3d 895, 906 (9th Cir. 2001) (en banc) (emphasis added) (Ferguson, J., writing for a majority on this issue).

What is missing in the search of Rodgers' vehicle for S.F.'s identification is any specific particularized fact indicating that S.F. had identification and that such identification was located in Rodgers' car. Although Moody testified extensively about the facts that he relied upon to justify the extended investigation of Rodgers and S.F.—the late hour, the high-crime area, the suspicious relationship between the two, the evasive answers to questions, the arrest warrant, and S.F.'s false statement—none of these facts are probative of whether there

was "probable cause to believe that the vehicle contain[ed] evidence of a crime." *Brooks*, 610 F.3d at 1193.

**[9]** Despite his detailed testimony, Moody did not identify any particular facts or observations that led him to believe S.F. had identification and that it was inside Rodgers' car. Nor can we find any such facts in the record. There is, for example, no indication that Moody saw S.F. trying to hide anything in the car, that S.F. was eyeing anything inside the car, that S.F. made any furtive movements, or that any papers or objects appearing to be identification were in plain view. Indeed, the only relevant fact Moody offered—that he never saw a purse or bag that might have contained S.F.'s identification—cuts against a finding of probable cause to search the car.

**[10]** When asked during the suppression hearing why he had reason to believe that S.F. "might have identification," Moody's only response was baffling: "Well, if she's going to stick with a story about being 19 years old, I know that, based on my training an experience, most 19-year-olds have some form of identification." But it is undisputed that Moody did not think S.F. was 19 years old and that she was the passenger, not the driver. Moody's entire extended investigation was predicated on his suspicion that S.F. was much younger. The Government nonetheless expects us to hold that Moody's reliance on the veracity of the lie—that S.F. was 19 years old—was somehow reasonable, despite Moody's belief to the contrary. This approach turns the objective facts standard on its head—a known lie can hardly be an objective fact. Even if we were to accept the lie as a half-truth, Moody's rationale is nothing more than a half-baked hunch, and it is well-established "that 'hunches' are insufficient to establish reasonable suspicion, let alone probable cause." *Johnson*, 256 F.3d at 905 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123-

24 (2000)). Notably, Moody was never asked what led him to believe the identification was actually within Rodgers' car.[6]

As an alternative rationale, the Government offers that it was reasonable for Moody to assume that S.F. had identification because individuals in Washington can obtain a driver's license at sixteen. This backtracking does not fix the gap. Nothing in the record supports such a rationale. Moody, in fact, thought S.F. was twelve or fourteen, well below the driving age, and Washington law certainly does not require passengers to carry identification.[7] *State v. Barwick*, 833 P.2d 421, 423 (Wash. Ct. App. 1992), *abrogated on other grounds*

---

[6]The dissent would uphold the search on one of two widely divergent theories. Either S.F., pretending to be nineteen would have hidden a fake ID in Rodgers' car, or "she may have hidden real identification, such as a YMCA [or Associated Student Body] card, which might reflect that she was *not*, in fact, nineteen." Dissent at 17020. Either of these scenarios are *possible*, but neither is *probable* and neither is supported by any facts in the record. (Do Associated Student Body cards even exist anymore? Does a YMCA card even contain an individual's age? Library cards certainly don't.).

The dissent is predicated on "mights." But the Fourth Amendment does not allow us to uphold a search based on imagined circumstances drawn out of thin air *ex post*. It requires factual specificity based on the objective facts known to the officer at the time of the search. All Moody knew that night was that S.F. had likely lied about her age. Every other assumption the dissent relies upon to support the search—S.F. *could have* lied about having identification, she *could have* had a fake ID or YMCA card that *could have* had her real age on it, and she *could have* stashed identification in Rodgers' car—is nothing more than a hunch crafted in hindsight.

[7]We note that the Fourth Amendment does not prevent police from "ask[ing] people who have legitimately been stopped for identification." *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007). Nor is it impermissible for police to arrest an individual for failure to properly identify herself or produce identification if such conduct violates state law. *See Hiibel v. Sixth Judicial Dist. Court. of Nev., Humboldt County*, 542 U.S. 177, 187-88 (2004). But the Fourth Amendment does not permit the search of a car for a passenger's identification where state law does not require passengers to carry identification and there is no basis in the record to believe that the identification is located inside the car.

*by State v. Cole*, 871 P.2d 656, 658 (Wash. Ct. App. 1994). But, more importantly, an assumption that most sixteen-year-old passengers have identification does not lead to probable cause to search every car carrying a teenager absent some individualized suspicion regarding the teenager, the vehicle in question, and the crime at issue.

**[11]** Without any objective facts indicating that S.F.'s identification was in Rodgers' car, we cannot endorse the significant intrusion of the search.[8] "The Supreme Court has emphasized that probable cause 'demands' factual 'specificity' and 'must be judged according to an objective standard.' " *Johnson*, 256 F.3d at 905 (quoting *Terry*, 392 U.S. at 21-22 n.18)). The search was unconstitutional. All the physical evidence seized and Rodgers' subsequent statements to police must be suppressed under the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963); *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc).

**REVERSED AND REMANDED**.

---

[8]We acknowledge the difficult circumstances police officers face in making quick judgments and are wary of overanalyzing their investigative methods, especially when a child's life could be in danger. But nothing about the search here addresses that concern. The search of the vehicle for S.F.'s identification as a means to protect S.F. seems superfluous at best. Police already had more than enough evidence to arrest S.F. and take her into custody. Moody knew of the outstanding warrant and had reason to believe S.F. committed new crimes based on her false statements. As it turned out, police never recovered any identification, and yet they still arrested S.F. on the warrant. In addition, there is no indication police searched S.F.'s person, the most likely place to find identification, before searching Rodgers' car. It is difficult to justify the serious invasion of Rodgers' privacy in search of evidence that bore no relationship to concerns about S.F.

CALLAHAN, Circuit Judge, dissenting:

The police acted admirably, reasonably, and *lawfully* throughout the events giving rise to this case. Accordingly, I respectfully dissent.

The initial stop of the car was lawful. Officer Moody testified that there was a stark difference between the color listed on the car registration records and the actual color of the car. Officer Moody, an experienced police officer, thought this discrepancy to be suggestive that the car was stolen. Further, the stop was made at 3:30 a.m., in a high-crime area that had a prevalence of car thefts. These factors were more than sufficient to support a finding of reasonable suspicion. *See United States v. Malone*, 886 F.2d 1162, 1165 (9th Cir. 1989) ("Wholly lawful conduct may justify a reasonable suspicion of criminal activity.") (internal citation omitted).

For a search to be lawful under *United States v. Ross*, 456 U.S. 798 (1982), there must be "probable cause to believe that contraband [or evidence] is concealed somewhere within" the car. *Id.* at 800. As the majority notes, probable cause to search is evaluated in light of the totality of the circumstances. *United States v. Pinela-Hernandez,* 262 F.3d 974, 978 (9th Cir. 2001). Thus, context is key. Here, when the search is considered *in context*, it was supported by probable cause, and thus justified under *Ross.*

In the wee hours of the morning and in a high crime area known for juvenile prostitution, Officer Moody had stopped Rodgers, a man in his fifties who was driving a young girl. The girl appeared to be only twelve or fourteen years old, and she was "nervous" and "didn't want to make eye contact." She told Officer Moody that she did not have any identification. Meanwhile, the older man told Officer Moody that the girl was "a friend" of his, which — under the circumstances — aroused Officer Moody's suspicions. Understandably, Officer Moody was concerned that the girl was an underage

prostitute and the man was "pimping [her] out," or that the girl was a runaway or a missing person. He simply did not know. So, he continued to investigate.

He asked the girl her name and birthdate, and the girl said that she was nineteen years old and provided a birthdate consistent with that age. Based on his observations about the girl's youthful appearance, Officer Moody thought she was lying, and he ran a police records check on the information she gave him. He discovered that there was an outstanding arrest warrant on a robbery charge for a *sixteen* year-old with the same name, month, and day of birth that the girl had provided. Officer Moody thought the young girl was "possibly" the same person named in the warrant, which would make her sixteen years old. He did not know her true identity or her relationship to the older man, and he reasonably believed that she had already lied to him once. Under these circumstances, Officer Moody did what any reasonable officer would do, and what any parent or concerned member of the public would want an officer to do when a young girl's life may be in danger: he continued to investigate.

He called for backup, and when another officer arrived on the scene, Officer Moody asked him to estimate the age of the young girl. The other officer said he thought the girl was only *twelve* years old. At this point, the girl and the older man were told to exit the car, and upon further police questioning the man changed his story and said he had just met the girl (as opposed to his earlier statement that she was "a friend" of his), and that he was giving her a ride at another friend's request.

At this point, Officer Moody had serious concerns as to the girl's age, identity, and the reason(s) for her presence in the car. He did know that she was riding in a car with a much older man, in the early morning hours and in an area known for juvenile prostitution, and that the older man had changed his story about his relationship with the girl. He also knew

that from all appearances, the girl had lied about her age, thus committing the crimes of making a false statement to a police officer and obstructing a law enforcement officer.

Officer Moody thought that, despite what the girl had told him earlier, she did have some identification with her because "if she's going to stick with a story about being 19 years old, I know that, based on my training and experience, most 19-year-olds have some form of identification." On the other hand, she might be as young as 12, and in that case she might have identification in the form of an "ASB card"[1] or "YMCA card." Identification for the girl, whether false or real, would be evidence of her crimes of making a false statement or obstruction. Identification could also offer insight as to whether the girl needed police protection. Under these circumstances, Officer Moody reasonably searched the "lunge area of the car" — the area in which she could have hidden her identification — for identification, and found the evidence that Rodgers now seeks to suppress.

Contrary to the majority view, the above facts do support a finding of probable cause for the search. Identification such as drivers' licenses, "ABS" cards, and "YMCA" cards are obviously small enough to be easily stashed in car compartments and alcoves. Here, Officer Moody correctly suspected that the girl and her older male companion were hiding the girl's true age, and he was reasonable in suspecting that they were hiding their relationship and their plans for the late hour. Believing that the girl had already lied about her age, it was certainly reasonable for Officer Moody to suspect that she had also lied about not having identification with her. Accordingly, he reasonably searched the lunge area of the car.

The majority notes that Officer Moody did not observe a

---

[1]This term is not defined in the record, but presumably Officer Moody was referring to an identification card issued by a school, an "Associated Student Body" card.

bag or a purse where identification could be stashed, but the lack of a bag or purse only heightened the possibility that the girl may have hidden her identification in the car. Given that the girl was pretending to be nineteen, she may have hidden false identification to support that story, which would be evidence of her crimes of making a false statement or obstruction. Or, she may have hidden real identification, such as a YMCA card, which might reflect that she was *not*, in fact, nineteen. That would also be evidence of her crimes. Officer Moody already thought the girl was lying about her age, so it makes sense that he disbelieved her comment that she did not have any identification on her.[2]

Probable cause does not require airtight certainty. *See United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006)

---

[2]The majority dismisses these scenarios as mere "hunches" and asks, "Do Associated Student Body cards even exist anymore? Does a YMCA card even contain an individual's age?" Majority at 17015. I do not know the answers to these questions — and neither does the majority — but in any case they are not dispositive. Officer Moody testified about *his* belief that the young girl may have had an ASB or YMCA card that would shed light on her true identity, and this belief was reasonable under the circumstances (particularly since it appears that neither the majority nor myself knows enough about ASB and YMCA cards to suggest otherwise). Officer Moody also testified to *his* belief that the girl might have identification because she was "stick[ing] to a story about being 19 years old." Notably, the district court found Officer Moody to be "entirely believable."

Contrary to what the majority states, what Officer Moody "knew" that night was more than just that the girl had lied about her age. Majority at 17014-15. As I stated earlier, *context is key*. A girl and an older man were traveling together at a late hour in an area known for underage prostitution; the girl looked incredibly young and was lying about her age; the older man was changing his story about who the girl was and why she was with him; identification cards are easily stashed in small places; and there was no purse or bag anywhere near the girl (which might suggest an alternate place to keep identification). These facts and others, as well as inferences that logically flow from them, reasonably suggested to Officer Moody that he would find identification for the girl in the lunge area of the car. Officer Moody's search of the lunge area was supported by probable cause.

(en banc). In close cases where a child's life may be in danger, police officers should receive the benefit of the doubt — not hindsight admonitions from the bench. Here, the facts known to Officer Moody at the time of the search were sufficient to support probable cause, and the search was lawful under *Ross*.

In addition, although the Government did not rely on *Arizona v. Gant*, 556 U.S. 332 (2009), we can affirm on any grounds supported by the record. *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1121 (9th Cir. 2008). Here, *Gant* authorizes the search because it was reasonable for Officer Moody to believe that the lunge area of the car contained some identification for the young girl, and identification would be evidence of two crimes for which she was arrested (i.e., making a false statement and obstruction). Moreover, the identification might reveal whether the girl was a minor, and in need of protection. Even if the probable cause standard were not met here — which it is, as explained above — the facts are sufficient to support the "reasonable to believe" standard set forth in *Grant*.

For the reasons set forth above, I respectfully dissent.