**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

JACOB DEL MUNDO FAAGAI, AKA
Jacob Faagai-Del Mundo, AKA
Jake,
    *Defendant-Appellant.*

No. 15-10621

D.C. No.
1:13-cr-00653-
SOM-6

OPINION

Appeal from the United States District Court
for the District of Hawaii
Susan Oki Mollway, Senior District Judge, Presiding

Argued and Submitted February 24, 2017
Honolulu, Hawaii

Filed September 7, 2017

Before: Alex Kozinski, Michael Daly Hawkins,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Kozinski

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's order denying the defendant's motion to suppress contraband seized during a warrantless search of the defendant's truck.

The panel held that under the totality of the circumstances, there was probable cause to believe that contraband would be found in the truck, and that the search was therefore permissible under the automobile exception to the warrant requirement.

Dissenting, Judge Kozinski wrote that the government, whose case rests on four meetings between the defendant and a suspected meth dealer, came nowhere close to meeting the probable cause standard, where officers, who observed most of the meetings and wiretapped the dealer's phone, never saw a handoff of money or contraband, nor heard an explicit mention of drugs.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Thomas M. Otake (argued), Honolulu, Hawaii, for Defendant-Appellant.

Chris A. Thomas (argued), Assistant United States Attorney; Florence T. Nakakuni, United States Attorney; United States Attorney's Office, Honolulu, Hawaii; for Plaintiff-Appellee.

## OPINION

BEA, Circuit Judge:

### I. Background

From August to November 2012, John Penitani ("Penitani") was the primary target of a court-authorized wiretap investigation. The purpose of the investigation was to identify Penitani's drug trafficking organization, including his sources of methamphetamine.

Law enforcement agents began investigating Penitani in July 2012, based on the seizure of 14 ounces of methamphetamine and approximately $3,600 from Penitani's cousin, Makusi Penitani ("Makusi"). Makusi told law enforcement agents that he had obtained the seized methamphetamine from Penitani and that he had been purchasing approximately one to two pounds of methamphetamine a month from Penitani.[1]

---

[1] The dissent ignores this evidence of Penitani's prior acts of methamphetamine distribution.

Appellant Jacob Del Mundo Faagai ("Faagai") was introduced to Penitani by Julius Mitchell ("Mitchell"). Law enforcement agents knew that Mitchell and Penitani had previously engaged in three illegal drug transactions before this introduction took place.[2] In addition, Mitchell had assisted Penitani in collecting a drug debt that Makusi owed to Penitani.

On October 29, 2012, Penitani met Faagai alone at a restaurant in West Oahu. Beforehand, Penitani asked Faagai in an intercepted telephone conversation: "You by yourself[,] eh?" Faagai responded, "Yeah, yeah automatic." Agents observed Penitani and Faagai at the restaurant, but could not hear what the two men discussed. In an intercepted telephone call after the meeting, Penitani asked Mitchell whether Faagai was "trustworthy," and told Mitchell, "I said I just hope he don't try to do me wrong."

Later that same day, agents intercepted another call between Penitani and Faagai, in which Faagai was attempting to locate Penitani at the Pearlridge Shopping Center for what appeared to be a pre-planned meeting. Drug Enforcement Administration Special Agent Clement Sze ("Special Agent Sze") testified that he believed that although agents were not able to conduct surveillance of that meeting, they believed, based on the entirety of their investigation, that Penitani and Mitchell were meeting Faagai to supply him with methamphetamine.

---

[2] These prior acts of illegal drug transactions are similarly ignored by the dissent.

On November 4, 2012, law enforcement agents seized five pounds of methamphetamine from a courier whom Penitani's supplier had sent to Hawaii.

On November 5, 2012, agents intercepted a text message from Faagai to Penitani in which Faagai said that he was going to Costco in Kapolei "to buy food for [his] house" and that if Penitani "gotta buy food for [Penitani's] house," they should meet at Costco. Special Agent Sze testified that he believed that Faagai was using "food" as a code word for "money." He also testified that he believed that Faagai wished to arrange a meeting in which he would pay Penitani for methamphetamine that Penitani fronted to him on October 29.[3] Defense counsel did not object to this opinion testimony. Agents traveled to the Costco in Kapolei and observed Penitani and his then girlfriend, Keschan Taylor, exit Costco and drive away. Agents did not see Faagai in the area, but Special Agent Sze testified that the agents believed that the meeting between Faagai and Penitani had already taken place.

Four hours later, agents intercepted a text message from Penitani to Faagai stating, "Man thanks to this broad I lost ten large. Man sorry taking long with da tools bro." Special Agent Sze testified that he believed that Penitani was indicating to Faagai that he had lost $10,000, and that "tools" referred to methamphetamine. Once again, defense counsel did not object to Special Agent Sze's opinion testimony.

---

[3] The dissent insists there was no expert testimony that "food" referred to "money" or that "tools" referred to "methamphetamine." However, Special Agent Sze was qualified as an expert in just such expertise: the government questioned him about his expertise in translating words used in drug deals, the government asked for his opinion, and there was no objection.

At 6:36 p.m. that same day, Faagai sent a text message to Penitani that read, "I really need my tools so I can get back to work bro wat [sic] time we looking at." Special Agent Sze testified that he believed that Faagai was asking Penitani for methamphetamine and that Faagai wished to know what time they would be meeting. Two minutes later, Faagai sent Penitani the following text message: "Thanks brradah dont wanna lose my job."

At 7:11 p.m., Penitani responded: "On my way." Faagai replied: "OK braddah thank u$." At 7:46 p.m., agents intercepted a telephone call between Penitani and Faagai in which they discussed where they should meet. Penitani suggested McDonald's in Waianae, but was concerned that there would be "[p]lenty [of] people" there. Faagai suggested Jack In The Box in Waianae, which typically had "hardly any people" there. Penitani agreed to meet at the Jack In the Box.

Law enforcement agents conducted surveillance at the Jack In The Box and did not see Faagai or Penitani. At 8:14 p.m., agents intercepted a text message from Penitani to Faagai changing the location of the meeting to a 7-Eleven. The agents drove to the 7-Eleven at 8:30 p.m., where they saw Faagai in the parking lot, leaning into the passenger side window of Penitani's car. Penitani and Faagai had already been there for approximately 15 minutes.[4] Moreover, Special Agent Sze testified that he believed that the drug transaction had already occurred by the time agents arrived on scene.

---

[4] Special Agent Sze testified that agents believed that Faagai and Penitani had arrived fifteen minutes prior because there was a fifteen-minute lapse between when the text message was received and when law enforcement agents observed them at the 7-Eleven.

At approximately 9:00 p.m., Faagai left the 7-Eleven parking lot and drove west on Farrington Highway. Special Agent Sze had arranged for Honolulu Police Department Sergeant Leslie Morris to make a purported traffic stop of Faagai. At 9:05 p.m., Sergeant Morris pulled Faagai over and told him that his vehicle had been identified as having been involved in a robbery. Sergeant Morris asked Faagai for consent to search the vehicle. Faagai refused and became belligerent. Sergeant Morris then instructed Faagai to exit the vehicle. Faagai complied, sat on the curb of the road, and made calls on his cell phone.

Soon after, some of Faagai's friends arrived and became belligerent and verbally combative toward Sergeant Morris. Special Agent Sze approached and intervened, informing Faagai that he was investigating a robbery and that the truck Faagai was driving was identified as being involved in the robbery. Special Agent Sze asked Faagai for consent to search his vehicle, but Faagai refused.

Next, Special Agent Sze asked Faagai where he had come from, and Faagai said (falsely) that he had come from Jack In The Box where he had picked up food for his family. Special Agent Sze asked whether he had come from somewhere else, but Faagai insisted that he had come from Jack In The Box, rather than the 7-Eleven where, agents knew, he had met Penitani. Marked police cars pulled up, and Faagai was detained on the sidewalk.

Special Agent Sze began to search Faagai's vehicle, and Faagai asserted that the backpack in the front passenger seat belonged to his uncle. Special Agent Sze found drug paraphernalia in the backpack, as well as approximately half of a pound of methamphetamine in a plastic bag located in

the back pocket of the front passenger seat. Faagai was arrested.

Faagai was charged with conspiracy and possession with intent to distribute 50 grams or more of methamphetamine, its salts and isomers and salts of its isomers, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846.

On March 6, 2014, Faagai filed an initial motion to suppress the contraband seized during the vehicle search. Faagai, who obtained new counsel, filed a subsequent motion to suppress on October 27, 2014. An evidentiary hearing was held on November 21, 2014.

The district court denied the motion, concluding that the automobile exception to the warrant requirement justified the warrantless search of Faagai's truck. The district court concluded that agents had probable cause to search Faagai's vehicle based on the following facts: First, "Faagai-Del Mundo was associating with Penitani, an individual under investigation as a drug distributor who was considered the source of recently seized methamphetamine." Second, "agents knew from their wiretap investigation that Penitani had been introduced to Faagai-Del Mundo by Julius Mitchell, a suspected drug trafficking associate of Penitani's." Third, "Penitani's concern about whether others were around [during the October 29 meeting] and Faagai-Del Mundo's response that it was 'automatic' that he was alone signaled that clandestine activity was occurring." Fourth, "Penitani asked Mitchell if Faagai-Del Mundo was 'trustworthy' and expressed his hope that Faagai-Del Mundo would not do him wrong," which "further suggested that Faagai-Del Mundo was involved in illicit activity." Fifth, "Penitani and Faagai-Del Mundo appeared to speak in code. . . . The use of terms

such as 'tools' does not mesh with anything else in the record about Penitani. There is no indication that law enforcement agents had information at the time tying Penitani to construction work, mechanical work, or other manual labor. The messages regarding Faagai-Del Mundo's 'work' and 'job' indicated that Penitani and Faagai-Del Mundo were involved in some sort of income-related activity." Sixth, "Faagai-Del Mundo became belligerent upon being told by Sergeant Morris that his vehicle was believed to have been involved in a robbery." Seventh, "during the course of Faagai-Del Mundo's conversation with Special Agent Sze on November 5, 2012, Faagai-Del Mundo lied about where he had been." The district court concluded, "[g]iven the totality of circumstances, there was a fair probability that contraband or evidence of a crime would be found in Faagai-Del Mundo's vehicle."

Pursuant to a plea agreement, Faagai entered into a conditional guilty plea on Count 1 (the conspiracy charge), which reserved his right to appeal the district court's suppression ruling. Faagai was sentenced to 188 months of imprisonment followed by a five-year term of supervised release. Faagai appeals his judgment of conviction.

## II. Standard of Review

"Whether there is probable cause to support the warrantless search of an automobile is a mixed question of law and fact reviewed de novo." *United States v. Ibarra*, 345 F.3d 711, 715 (9th Cir. 2003) (citing *Ornelas v. United States*, 517 U.S. 690, 696–97 (1996)).

### III. Discussion

Faagai argues that "[t]he circumstances that the district court relied on, in sum, add up at most to probable cause to believe that the defendant was becoming involved with Penitani's criminal activity. They did not support concluding the entirely different proposition that the truck would contain drugs when agents searched it."

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, searches typically must be conducted pursuant to a warrant issued by an independent judicial officer. *California v. Carney*, 471 U.S. 386, 390 (1985). However, there are exceptions to this general rule, including the "automobile exception," under which a warrantless search of a vehicle is permitted "if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). Probable cause exists if there is a "fair probability that contraband or evidence of a crime will be found in a particular place," under the totality of the circumstances. *United States v. Rodriguez*, 869 F.2d 479, 484 (9th Cir. 1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "A finding of probable cause must be supported by the objective facts known to the officer at the time of the search." *United States v. Rodgers*, 656 F.3d 1023, 1029 (9th Cir. 2011).

Under the totality of the circumstances, there was probable cause to believe that contraband would be found in Faagai's truck. Faagai was associating with Penitani, a known drug dealer. Moreover, Faagai had been introduced to

Penitani by Mitchell, one of Penitani's drug dealing associates; law enforcement agents knew that Mitchell and Penitani had previously engaged in three illegal drug transactions and that Mitchell had assisted Penitani in collecting a drug debt.

As for the October 29 meeting, Penitani's concern that he and Faagai meet alone suggests that they were engaging in illicit activity. As Special Agent Sze testified, "Drug distribution is a risky endeavor, and when you meet someone new, you're already exposing yourself; so you definitely want to reduce the number of people that you are meeting."

And after the meeting, Penitani enquired of Mitchell whether Faagai was "trustworthy." Considering the circumstances of the meeting, it is apparent that Penitani was asking whether Faagai was sufficiently "trustworthy" to participate in drug transactions. Penitani's statement, "I said I just hope he don't try to do me wrong," was a veiled threat against Faagai if he proved to be untrustworthy. There is probable cause to believe that Faagai intended to engage in drug dealing with Penitani.

As for the November 5 meetings, the circumstances suggest that they related to a drug transaction. The Costco in Kapolei where Faagai suggested that he and Penitani meet was located 24 miles away from where Penitani lived in downtown Honolulu. Moreover, there was another Costco located about a quarter of the distance away from downtown Honolulu. It is unlikely that Faagai and Penitani met at the Kapolei Costco to shop for food.

Later that day, agents intercepted a text message from Penitani to Faagai stating, "Man thanks to this broad I lost ten

large. Man sorry taking long with da tools bro." Special Agent Sze testified to his belief that Penitani was indicating to Faagai that he lost $10,000, and that "tools" referred to methamphetamine. Later that day, Faagai sent a text message to Penitani that read, "I really need my tools so I can get back to work bro wat [sic] time we looking at." Special Agent Sze testified that he believed that Faagai was asking Penitani for his methamphetamine and that Faagai wished to know what time they would be meeting. As the district court found, the use of the term "tools" is suspect because "[t]here is no indication that law enforcement agents had information at the time tying Penitani to construction work, mechanical work, or other manual labor." This court gives "due weight to inferences drawn from [findings of historical] facts by resident judges and local law enforcement officers." *Ornelas*, 517 U.S. 690, 699 (1996).

At the hearing, defense counsel stated that Faagai *is* in the construction business, but conceded that Penitani is *not*. Even assuming that Faagai may have needed tools for his work, there is no indication that Penitani would have been able to supply them. The dissent accuses the majority of misunderstanding the relationship of Penitani and Faagai as to "tools." But the dissent bases the claim of such misunderstanding on the assumption that Penitani borrowed tools from Faagai. There is nothing in the record to substantiate that assumption; not even that Faagai wanted his "tools" *back* from Penitani.

When Penitani and Faagai discussed where they should meet, they agreed to meet at Jack In The Box rather than McDonald's, because the Jack In The Box typically had "hardly any people." The fact that Faagai and Penitani changed the location of their meeting based on the number of

people present—not the food served—suggests that they planned to engage in illicit activity rather than eat dinner together. Special Agent Sze testified, "Typically, for drug traffickers, they prefer to do their trafficking discretely and away from people so that . . . they're not caught or they're not observed by other people."

Penitani and Faagai subsequently changed the location of their meeting to 7-Eleven. At the 7-Eleven, agents observed Faagai walk away from Penitani's car and toward his own truck without anything in his hands. Agents did not observe the entirety of the meeting, which lasted roughly 15 minutes. Because the circumstances indicate the purpose of the meeting was to engage in a drug transaction, there is probable cause to believe that Penitani had delivered drugs (the promised "tools") to Faagai, and that these drugs could be found in Faagai's truck.

Why in Faagai's truck? We know that there was probable cause to believe Penitani brought the "tools" (the drugs) so that Faagai could "get back to work" and not "lose [his] job" (deal the drugs). We know that Faagai arrived at the 7-Eleven in a vehicle, because he drove away in his truck. When the police saw Faagai leaning into the window of Penitani's car, he had nothing in his hands.

Where could the "tools" (drugs) be located? In Penitani's car? Unlikely, because the purpose of the meeting was for Penitani to deliver drugs to Faagai and Faagai left the scene in his truck. On Faagai's person? Perhaps, but unlikely given that in prior transactions, Penitani had dealt in pounds of methamphetamine. Hidden in the environs of the 7-Eleven? Unlikely, given the high value of the drugs. In Faagai's truck? More likely than not.

Lastly, during the purported traffic stop, Faagai's belligerent reaction to Sergeant Morris's assertion that his vehicle was believed to have been involved in a robbery, as well as Faagai's dishonesty regarding where he had come from, both indicate that Faagai was engaging in illicit activity with Penitani. The dissent generously and kindly allows that Faagai "fudged his story when pulled over." When asked where he had been, Faagai twice asserted that he had been at Jack In The Box, when in fact the agents saw Faagai and Penitani in the 7-Eleven parking lot. "Fudged"? The reader can judge.

Accordingly, under the totality of the circumstances, there was probable cause to believe that contraband would be found in Faagai's truck. Thus, the warrantless search of his vehicle was permissible under the automobile exception.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's order denying the motion to suppress.

KOZINSKI, Circuit Judge, dissenting:

Probable cause requires "facts indicat[ing] that [law enforcement officers] will find what they are looking for in the place to be searched." *United States* v. *Johnson*, 256 F.3d 895, 906 (9th Cir. 2001) (en banc). This is not a high standard but the government came nowhere close to meeting it here.

The government's entire case rests on four meetings between Faagai and John Penitani, a suspected meth dealer. Despite observing most of these meetings and assiduously wiretapping Penitani's phone, officers never saw a handoff of money or contraband, nor heard an explicit mention of drugs. In fact, they saw and heard nothing objectively suspicious.

The most probative evidence supporting the search was a conversation between Penitani and Faagai where they discussed meeting at Costco to buy food. Agents testified that they "believed [food] to be a code" for drugs. But there was no expert testimony or any other evidence supporting the speculation that food stood for drugs. *See United States* v. *Bailey*, 607 F.2d 237, 240 & n.6 (9th Cir. 1979) (discussing expert's testimony on the meaning of alleged code words). Many people go to Costco to buy food. If talking about shopping for food at Costco were sufficient to justify a search, many of us would be searched by the police twice a week—thrice right before Thanksgiving. Nor does it make any sense to substitute food for drugs when talking about *where* to meet. If Penitani and Faagai were meeting up to conduct a drug deal, why specify the purpose of the meeting? Why say "Let's meet at Costco for a drug transfer" rather than just "Let's meet at Costco," with the purpose of the meeting understood?

There was nothing remotely suspicious about the two men's discussion of "tools." The majority seems to misunderstand their relationship when it states that "[e]ven assuming that Faagai may have needed tools for his work, there is no indication that Penitani would have been able to supply them." But since Faagai worked in construction, he would presumably have needed and owned certain tools. And when Faagai texted Penitani "I really need my tools so I can

get back to work bro wat time we looking at," Faagai was clearly requesting *his* tools, implying that Penitani had borrowed tools that belonged to Faagai and that were necessary for Faagai's work.  Penitani even apologized to Faagai for "taking long with da tools," which would make sense if the tools were Faagai's to begin with.  Why is it suspicious or implausible that Penitani, who wasn't in construction, would borrow tools from Faagai, who was? The majority never explains.

The fact that the two men decided to meet in a place with "hardly any people" cuts the wrong way.  The government commonly argues that drug dealers intentionally seek out busy locations because a "high volume of pedestrian and vehicle traffic can mask drug-dealing activity." *United States* v. *Ruiz*, 785 F.3d 1134, 1138 (7th Cir. 2015).  Here, the government claims the opposite, evidently trying to have it both ways.  At best, this fact is irrelevant:  There was nothing incriminating about the two men's preference for a quieter location.

The majority deems it "unlikely that Faagai and John Penitani met at the Kapolei Costco to shop for food" because there was another Costco much closer to downtown Honolulu.  But as savvy shoppers know, not all Costcos are the same.  For example, the Kapolei location is twenty years newer than its downtown Honolulu counterpart, and features a "fresh deli."  *Compare* Costco Wholesale, *Find a Warehouse: Kapolei Warehouse*, *https://www.costco.com/warehouse-locations/kapolei-hi-1038.html* (last visited July 14, 2017), *with* Costco Wholesale, *Find a Warehouse: Iwilei Warehouse*, *https://www.costco.com/warehouse-locations/iwilei-honolulu-*

*hi-687.html* (last visited July 14, 2017). These are entirely innocent reasons for preferring the Kapolei store.

The majority's remaining justifications for the search fare even worse. Officers told Faagai that his vehicle was involved in a robbery: Faagai knew this wasn't the case, so his indignant response makes perfect sense. Since any innocent person might react that way, I don't understand how his outburst suggests drug dealing. To the contrary, I should think that someone hauling drugs would be *less* likely to mouth off to the police. That Faagai walked away empty-handed from Penitani's truck suggests nothing at all about drug trafficking. And while one might wonder why Penitani asked his associate about Faagai's trustworthiness, or why Faagai fudged his story when pulled over, this hardly indicates there were drugs in the car when Faagai was stopped.

At no point was there obvious evidence of drug dealing. Instead, the government relies entirely on Faagai's association with Penitani, viewing their every interaction as suspicious because of Penitani's drug-dealing past. But for Penitani's history, these interactions would seem perfectly innocuous. And, as we have held time and again, mere association with others involved in criminal activity does not give rise to probable cause. *See United States* v. *Collins*, 427 F.3d 688, 691 (9th Cir. 2005); *United States* v. *Del Vizo*, 918 F.2d 821, 826 n.7 (9th Cir. 1990).

The majority strings together a sequence of events like beads on a strand, but doesn't explain how any of them provide probable cause that Faagai was carrying drugs in his car when he was stopped. Nor do my colleagues reckon with a long line of our cases holding that police suspicions lacking

objective evidence are insufficient to establish probable cause. *See, e.g.*, *United States* v. *Cervantes*, 703 F.3d 1135, 1139 (9th Cir. 2012); *Johnson*, 256 F.3d at 905; *United States* v. *Vasey*, 834 F.2d 782, 788 (9th Cir. 1987). Instead, they fall back again and again on their dubious theory of code words, treating words like "food" and "tools" as nefarious. There's a vicious circularity to this logic: With the luxury of hindsight, anything at all that Faagai and Penitani might've discussed can simply be labeled "code for drugs."

Here's what this case boils down to: Officers had a hunch that a drug transaction was going down. They saw nothing obviously suspicious, but got tired of waiting, watching and wiretapping. They then jumped the gun by executing a warrantless search. Until today, this was not enough to support probable cause, but going forward it will be. This is a green light for the police to search anyone's property based on what officers subjectively believe—or claim to believe—about someone's everyday conduct. That puts all of us at risk. Accordingly, I dissent, and I'm off to Costco to buy some food.